## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS

I, William Stacy Campbell III, Special Agent with the United States Fish and Wildlife Service, Office of Law Enforcement ("FWS-OLE") being duly sworn, depose and state under penalty of perjury that the following is true to the best of my information, knowledge and belief.

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a criminal complaint alleging that South African National CHARL LE ROUX submitted falsified hunting licenses to a United States Fish and Wildlife inspector for the purpose of impeding, corrupting, and influencing an investigation into the nature of a shipment of 23 animals, including a threatened Lechwe, and the proper administration of a matter relating to the import of those animals into the United States pursuant to the Convention on International Trade in Endangered Species and implementing laws and regulations.

2.      I am a Special Agent with the U.S. Fish and Wildlife Service, Office of Law Enforcement.  I have been a special agent with FWS-OLE for nineteen (19) years.  I am currently assigned to investigate crimes involving the illegal importation and transportation of wildlife.  During my tenure with FWS-OLE, I have participated in a variety of criminal wildlife investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants, reviewed bank records, shipping records, transportation records, and other business records, and retrieved and analyzed information in the Law Enforcement Management Information System ("LEMIS"), a database used by the United States Fish and Wildlife Service (the "Service") to keep track of, among other things, the declared importation and shipment of wildlife.  Through my training, education, and experience, I am familiar with the techniques and methods used by individuals involved in criminal wildlife trafficking.

3.      For the reasons set forth in more detail below, I submit that there is probable cause to believe that CHARL LE ROUX falsified a hunting license on or about March 5, 2019 in order to impede, obstruction, and influence a United States Fish and Wildlife inspector in her determination as to whether a shipment of 23 animals into the United States from South Africa could validly be imported into the United States.

4.      The facts set forth in this affidavit are based on my personal knowledge as the investigation's Case Agent; knowledge obtained from other individuals including law enforcement personnel, my review of documents, reports and other evidence.  Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.  The information contained within this affidavit does not represent every fact learned by law enforcement during the course of the investigation.  Rather, I have only included information sufficient to establish probable cause for the requested criminal complaints.

1

## <u>BACKGROUND: LAW AND REGULATIONS RELATED TO  TO WILDLIFE TRAFFICKING</u>

5.      The Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), was signed by the United States in 1973 and became effective in 1975. CITES, March 3, 27 U.S.T. 1087, 993 U.N.T.S. 243.  CITES regulate the international trade in wildlife by placing species onto three "Appendices" based on the species' relative threatened status:  species on Appendix One are the most seriously threatened and, therefore the most restricted; species on Appendix Two are not as threatened and can be traded with an appropriate permit; species on Appendix Three are those that are of concern only in a particular country and are the least regulated.

6.      The Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et seq., implements the provisions of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), which was signed by the United States in 1973 and became effective in 1975. CITES, March 3, 27 U.S.T. 1087, 993 U.N.T.S. 243 CITES, available at www.cites.org/eng/disc/text.php.  16 U.S.C. §1537(a).  Species listed by CITES 180 member nations are placed on one of three appendices and given a sliding scale of protection. 50 C.F.R. Part 23. Appendix I includes species threatened with extinction and is the most restrictive, banning plant trade between two countries for commercial purposes.  Appendix II allows commercial trade under permit for species not yet considered in danger of imminent extinction but which must be controlled in order to avoid utilization incompatible with survival. Appendix III contains species that are protected in at least one country which has asked the other CITES countries for assistance in controlling trade.

7.      Among the ways in which the ESA implements CITES is by providing for trade in sport hunted animals, providing that the duly-constituted CITES authority in the country from which the animal is hunted issues a CITES permit certifying that such trade is consistent with CITES.  50 C.F.R. §§ 14.61, 23.20; 23.27 & 23.74.

8.      The ESA makes it unlawful for any person to violate any regulation pertaining to endangered or threatened species listed by the Secretary of the Interior or Commerce. 16 U.S.C. § 1538(a)(2); 50 C.F.R. §§ 17.8; 23.13.  With exceptions not relevant here, the Secretary of the Interior requires that importers file U.S. Fish and Wildlife Service ("FWS") Form 3-177 entitled "Declaration for Importation or Exportation of Fish or Wildlife." 50 C.F.R. § 14.61.  The person filing this form, or his or her agent, must certify that the information in the form is "true and complete to the best of his/her knowledge and belief."  Id.  Form 3-177 is thus signed by the importer or agent under penalty of perjury.

9.      Consistent with the United States's responsibilities under CITES, FWS Form 3-177 requires that hunters describe the purpose of their import and provide relevant CITES permits for any CITES-protect animal.  This information is material to FWS's administration of the ESA and other laws because CITES and other laws allow importation only for certain

2

purposes. For example, CITES allows trade in "sport hunted" trophies. To qualify as a sport-hunted trophy, the animal, its parts, or its derivatives must meet certain criteria, including that it be "legally obtained by the hunter for his or her personal use." 50 C.F.R. § 23.74.

10.     Accordingly, a person seeking to import an animal into the United States after a hunt in a foreign country subject to CITES must meet the criteria in § 23.74 and have a valid CITES permit for the trophy they seek to import into the United States. 50 C.F.R. §§ 17.8; 23.20; 23.23. Among other things, the CITES permit requires (1) the identification of the animal, (2) the source of the animal, and (3) the purpose of the killing of the animal. *Id.* Obtaining a hunting trophy is among those valid purposes. *Id.*

### THERE IS PROBABLE CAUSE TO BELIEVE THAT CHARL LE ROUX KNOWINGLY SUBMITTED FALSE DOCUMENTS IN AN EFFORT TO FRAUDULENTLY IMPORT ANIMALS INTO THE UNITED STATES

**I.     The Shipment of 23 Animals from South Africa to Colorado**

11.     On or about February 14, 2019, a Customs Broker, whose identity is known to me, submitted a FWS Form 3-177 Declaration to the FWS (the "Original Declaration") for a shipment scheduled to arrive in Denver, Colorado, through Denver International Airport. The submission was assigned confirmation number 2019DN2369366. The form identified C.F., whose identity is known to me, as the "Importer/Exporter" of 23 animals:

|   | Common Name | Scientific Name |
|---|---|---|
| 1 | Kudu | *Tragelaphus strepsiceros* |
| 2 | Impala | *Aepyceros melampus* |
| 3 | Blesbuck | *Damaliscus pygargus phillipsi* |
| 4 | Burchell Zebra | *Equus burchellii* |
| 5 | Blue Wildebeest | *Connochaetes taurinus* |
| 6 | Blue Wildebeest | *Connochaetes taurinus* |
| 7 | Gemsbok | *Oryx gazelle* |
| 8 | Nyala | *Tragelaphus angasii* |
| 9 | Kudu | *Tragelaphus strepsiceros* |

3

|  | Common Name | Scientific Name |
|---|---|---|
| 10 | Impala | *Aepyceros melampus* |
| 11 | Blesbuck | *Damaliscus pygargus phillipsi* |
| 12 | Burchell Zebra | *Equus burchellii* |
| 13 | Gemsbok | *Oryx gazelle* |
| 14 | Nyala | *Tragelaphus angasii* |
| 15 | Bushbuck | *Tragelaphus scriptus* |
| 16 | Chacma Baboon | *Papio ursinus* |
| 17 | Burchell Zebra | *Equus burchellii* |
| 18 | Warthog | *Phacochoerus africanus* |
| 19 | Warthog | *Phacochoerus africanus* |
| 20 | Warthog | *Phacochoerus africanus* |
| 21 | Mountain Reedbuck | *Redunca fulvorufula* |
| 22 | Springbock | *Antidorcas marsuplalis* |
| 23 | Lechwe | *Kobus leche* |

Both the Red Lechwe (*Kobus Leche*) and the Baboon (*Papio ursinus)*, highlighted above, are listed on Appendix II of CITES. The Lechwe is also listed as a threatened species under the Endangered Species Act. 50 C.F.R. § 17.11. This means that importing the animals into the United States is only allowed for specific purposes consistent with CITES, such as obtaining a sport-hunted trophy. 50 C.F.R. §§ 17.8; 17.21 17.31; 23.13; 23.74. Box 5 of the Original Declaration, used to input the code designating the purpose of the shipment, contained the letter "H." That is the code used to declare the animals as sport-hunted trophies. That code would only be appropriate if C.F. personally hunted each of the 23 animals.

12.     The forms attached to the Original Declaration all represented that C.F. was the hunter of the 23 animals:

a.     CITES permit 216600, dated December 3, 2018, identified the importer as C.F.. Like the Original Declaration itself, the CITES permit declared the Lechwe and the Baboon

4

to be sport-hunted trophies.  The CITES permit states that it is not transferrable.  It further warns that failure to comply with any of the permit conditions renders the permit invalid and may result in criminal proceedings, cancellation of the permits, and seizure of consignments.

        b.      "South African Professional Hunting Register and Trophy Application" EC 25319 described a hunt between April 13, 2018 and April 24, 2018 (the "Original Hunting Register").  The Original Hunting Register bears a signature in the name of C.F. and further identifies him with an address and a passport number.  The date next to the signature is April 23, 2018.  The Original Hunting Register identifies C.F. as the hunter of the 23 animals listed in the Original Declaration, as well as an additional warthog.  It also identifies CHARL LE ROUX as the "Professional Hunter" and "Hunting Outfitter" providing the hunt and contains signatures in his name.

        c.      Hunting License 44789 identifies C.F. as a license-holder (the "Original Hunting License"). The Original Hunting License further identifies C.F. with his address.  It also contains a signature in C.F.'s name, dated April 3, 2018.  The front of the license says, in all-capital letters surrounded by a box, "NOT TRANSFERRABLE."  This is consistent with Section 27 of the Nature and Environmental Conservation Ordinance of 1974, which governs hunts in the Eastern Cape Province.  That section provides in pertinent part that "no person shall hunt any protected wild animal — during any hunting season, unless he is the holder of a . . . license in the prescribed form . . . or at any other time unless he is the holder of a permit to do so."

        d.      Two documents identified as "Permit to Export Wild Animal Products Out of the Eastern Cape Province" bearing numbers 201806000003418 and 201806000005790 collectively authorized the export of the 23 animals above to C.F. at his address in the United States (the "Original Export Permits").  These permits, like the hunting license, stated on their face in all capital letters "NOT TRANSFERRABLE."

        e.      A document entitled "True Reflection Taxidermy Invoice" also described the 23 animals listed in the Original Declaration.  The invoice, dated April 23, 2018, listed CHARL LE ROUX and the SUBJECT GOOGLE EMAIL ACCOUNT as a means of contact.  Handwritten next to each of the animals listed on the invoice were names.  "Clint" — which I believe, based on other evidence gathered in this case is a reference to C.F. — is next to some, "Brian," — which I believe, based on other evidence gathered in this case is a reference to B.C. — is next to others, and "Lane" — which I believe, based on other evidence gathered in this case is a reference to L.L. — is listed next to others.  Some animals have two or even all three names next to them.

     13.     On or about February 15, 2019, a FWS Wildlife Inspector Tracy Ellis stationed at Denver International Airport inspected the shipment of 23 animals, which were being held at an authorized taxidermy business in Broomfield, Colorado.  The shipment contained the 23 animals listed in the Original Declaration.  However, each of the animals had one of three different tags on them.

14.     The Wildlife Inspector Tracy Ellis called the Customs Broker on February 15, 2019 to ask whether all of the animals actually belonged to C.F., as represented in the Original Declaration.  The Customs Broker responded to the Wildlife Inspector by, among other things, forwarding correspondence with the SUBJECT OULOOK ACCOUNT associated with C.F..  One of those emails, sent from the SUBJECT OUTLOOK ACCOUNT to the broker at approximately 9:40 a.m., stated that there were "3 of us and identified them as B.C., L.L. and "myself" (C.F.).  Later that same day, at approximately 10:34, the Customs Broker emailed the Wildlife Inspector with an "attached breakdown of trophies" and noting "as you can see, there is a problem."  Attached to the email was another copy of the True Reflection Taxidermy Invoice listing the 23 animals and, type-written next to each one, the corresponding hunter:

|   | Common Name | Scientific Name | Hunter |
|---|---|---|---|
| 1 | Kudu | *Tragelaphus strepsiceros* | C.F. |
| 2 | Impala | *Aepyceros melampus* | C.F. |
| 3 | Blesbuck | *Damaliscus pygargus phillipsi* | C.F. |
| 4 | Burchell Zebra | *Equus burchellii* | C.F. |
| 5 | Blue Wildebeest | *Connochaetes taurinus* | C.F. |
| 6 | Blue Wildebeest | *Connochaetes taurinus* | C.F. |
| 7 | Gemsbok | *Oryx gazelle* | C.F. |
| 8 | Nyala | *Tragelaphus angasii* | C.F. |
| 9 | Kudu | *Tragelaphus strepsiceros* | L.L. |
| 10 | Impala | *Aepyceros melampus* | L.L. |
| 11 | Blesbuck | *Damaliscus pygargus phillipsi* | L.L. |
| 12 | Burchell Zebra | *Equus burchellii* | L.L. |
| 13 | Gemsbok | *Oryx gazelle* | L.L. |
| 14 | Nyala | *Tragelaphus angasii* | L.L. |
| 15 | Bushbuck | *Tragelaphus scriptus* | L.L. |
| 16 | Chacma Baboon | *Papio ursinus* | L.L. |

| | Common Name | Scientific Name | Hunter |
|---|---|---|---|
| 17 | Burchell Zebra | *Equus burchellii* | B.C. |
| 18 | Warthog | *Phacochoerus africanus* | B.C. |
| 19 | Warthog | *Phacochoerus africanus* | B.C. |
| 20 | Warthog | *Phacochoerus africanus* | B.C. |
| 21 | Mountain Reedbuck | *Redunca fulvorufula* | B.C. |
| 22 | Springbock | *Antidorcas marsuplalis* | B.C. |
| 23 | Lechwe | *Kobus leche* | B.C. |

15.     Wildlife Inspector Tracy Ellis also called C.F., B.C., and L.L. on February 15, 2019.  In sum and substance and in pertinent part, each respectively made the following statements:

a.     C.F. stated that (1) he hunted in South Africa with B.C. and L.L. in April 2018 for twelve days, (2) some of the animals in the shipment belong to B.C. and L.L., (3) the hunt was with CHARL LE ROUX, the owner of Rosedale Safaris and True Reflection Taxidermy, (4) he, B.C., and L.L. "drew straws" to determine who would have his name put on the shipment, (5) CHARL LE ROUX told them they could put only one name on their shipment, (6) True Reflection Taxidermy set up the required export permits, and (7) he did not kill the Lechwe or the Baboon.

b.     B.C. confirmed that he hunted with C.F. and L.L. in April 2018 as part of a safari organized through CHARL LE ROUX.  He also stated that (1) he killed the Lechwe, (2) he was never informed of the Lechwe's CITES status, (3) the three of them decided to put their collective trophies into one shipment, which they didn't see as an issue, and (4) he had previously exported trophies from South Africa to the United States in one shipment combining animals taken by himself, his brother and his father in law.[1]

---

[1] Records show that a shipment of approximately 27 animals cleared the port of Las Angeles in or about December 2016.  That shipment was similar to the 2018 shipment described throughout this affidavit in that all the animals were declared by one hunter and the hunt was with CHARL LE ROUX.  Paperwork associated with that shipment lists charlleroux3@gmail.com as a means of contacting LE ROUX.

c.      L.L., too, confirmed that he went hunting with C.F. and B.C. in April 2018 through CHARL LE ROUX.  He also stated that (1) he did not know the Baboon was a CITES species and (2) the Original Declaration was a simple error.  L.L. said they weren't smuggling and asked why they couldn't just change the respective permits to get the shipment through.

## II.      The Submission of Falsified Paperwork To Falsely Support the Shipment

16.      A man identifying himself as CHARL LE ROUX called the Wildlife Inspector at approximately 10:20 a.m. on February 19, 2020.  LE ROUX stated that he was calling on behalf of C.F., B.C., and L.L. about the hunting trophies that were being inspected in Denver.  LE ROUX claimed that he files similar paperwork with the South African authorities on a regular basis to get the required export permits.  Later, at approximately 10:46 a.m., the person using the email account charlleroux3@gmail.com sent an email to the wildlife inspector stating, in pertinent part, "Ive spoken to my gov and Ill be going there tomorrow to issue 2 new cities [sic] permits for the Lechwe and Baboon."  The sender identified himself as CHARL LE ROUX.

17.      Wildlife Inspector Tracy Ellis sent an email to charlleroux3@gmail.com on March 4, 2019 asking for a copy of the respective hunting licenses for C.F., B.C., and L.L..  On or about March 5, 2019 the person using the charlleroux3@gmail.com responded:  "please find the attached hunting licenses."

a.      Hunting License 44776 was attached to that email (the "March 5 B.C. License").  The license is issued to B.C.  However, below that name I can see the impressions of what appear to be someone else's name.  Moreover, although I am not a handwriting expert, I can see that the signature on the license does not appear to match the signature in B.C.'s name on a power-of-attorney provided to the Customs Broker:

8



b.      A South African Professional Hunting Register and Trophy Export Application with number EC 25334 was also attached to the March 5, 2019 email (the "March 5 B.C. Hunting Register").  This register identified B.C. as the client and listed his passport number.  Unlike the Original Hunting Register, which described the hunt as ending on April 24, 2018, the March 5 B.C. Hunting Register describes the hunt as ending on April 20, 2018.  The document contains a signature in B.C.'s name, dated April 20, 2018.  Although I am not a handwriting expert, I do not believe that the signature on the March 5 B.C. Hunting Register matches the signature for B.C. appearing on power-of-attorney forms submitted to the Customs Broker.

c.    A new version of hunting license 44789, issued to L.L., was attached to that email (the "March 5 L.L. License.")  The March 5 L.L. License is shown below on the right; the Original License is shown below on the left:

 

10

The March 5, 2019 L.L. License bears indicia of being false and fraudulent.  It (1) has the same license number as the Original License but different names and addresses, (2) appears to have L.L.'s name and address written over previous information for C.F. and (3) despite being in L.L.'s name has a signature in C.F.'s name.

       d.      A South African Professional Hunting Register and Trophy Export Application was also attached to the March 5, 2019 email (the "March 5 L.L. Hunting Register").  The scan of the document was off-center and, as a result, the top part of the application with its number and the date of the hunt is cut off.  This register identified L.L. as the client and listed his passport number.  The document contains a signature in L.L.'s name, dated April 20, 2018.  Although I am not a handwriting expert, I do not believe that the signature on the March 5 L.L. Hunting Register matches the signature for L.L. appearing on power-of-attorney forms submitted to the Customs Broker.

       e.      Hunting License 59551 was attached to that email (the "March 5 C.F. Hunting License").  The license is issued to C.F..  However, despite being issued to C.F. it has a different hunting license number than the Original Hunting License, which was also issued to C.F.  Furthermore, the March 5 C.F. Hunting does not contain C.F.'s complete address.  Finally, the signature in the name of C.F. on the March 5 C.F. Hunting License does not match the signature in the same name on the Original Hunting License, the signature in the same name on the Original Hunting Register, or the signature in the same name appearing on power-of-attorney forms submitted to the Customs Broker.



18.     A South African Professional Hunting Register and Trophy Export Application with number EC 25336 was also attached to the March 5, 2019 email (the "March 5 C.F. Hunting Register").  This register identified C.F. as the client and listed his passport number.  Unlike the Original Hunting Register, which described the hunt as ending on April 24, 2018, the March 5 C.F. Hunting Register describes the hunt as ending on April 20, 2018.  The document contains a signature in C.F.'s name, dated April 20, 2018.  This is different from the date in the Original Hunting Register, which was April 23, 2018.  Although I am not a handwriting expert, I do not believe that the signature on the March 5 C.F. Hunting Register matches the signature for C.F. appearing on the Original Hunting License, the Original Hunting Register, or power-of-attorney forms submitted to the Customs Broker.

19.     On March 7, 2019 the Customs Broker sent to the Wildlife Inspector emails attaching the respective power-of-attorney forms for C.F., B.C., and L.L. referenced above.

20.     That same day — March 7, 2019 — the person using the charlleroux3@gmail.com account sent an email to the Wildlife Inspector stating that hunting licenses are "issued before the hunt starts." This is consistent with my experience investigating

hunting-related crimes:  licenses must be issued before the hunt takes place and any effort to backdate a hunting license would be illegitimate.

21.     I personally interviewed the Customs Broker on June 14, 2019, accompanied by the Wildlife Inspector.  In sum and substance and in pertinent part, the Customs Broker made the following statements:

        a.     Among the services Customs Broker provides to clients is completing the documents required to clear a shipment of trophies through inspections, including relevant FWS inspections.  In order to do this, Customs Broker receives a power-of-attorney from the client.  In this case, Customs Broker initially interacted with C.F. and, at first, only had a power-of-attorney from him.

        b.     Customs Broker completed the Original Declaration with the authority granted him by C.F.'s power-of-attorney and based on the documents and representations made by C.F..  As a result, he used the code for sport-hunted trophies — putting an "H" into block 5 of the Original Declaration.  Although he did not have a specific conversation with C.F. prior to submitting the Original Declaration, C.F. received the document before it was submitted and never made any changes or suggested that it was inaccurate.

        c.     C.F. represented to Customs Broker that he was importing the shipment.  C.F. did not claim any of the animals belonged to anyone else until after Wildlife Inspector identified problems with the shipment.  Based on the documents provided by C.F., Customs Broker had no reason to believe the trophies belonged to anyone but C.F..  If Customs Broker had known that animals belonged to others, he would have asked for their respective power-of-attorney.

        d.     When Customs Broker told C.F. about the problem with the shipment, C.F. expressed irritation and stated that he believed they could combine the shipment because they were family members.

### III.     The Submission of a False Affidavit to Further Support the Shipment

22.     On October 28, 2019, an attorney claiming to represent C.F., B.C., and L.L. sent to an attorney for the government an email with an attached document.  The document comprised an affidavit from CHARL LE ROUX and five referenced pictures. The affidavit provided a South African ID number 8803285101084 and contained a signature in LE ROUX's name dated October 3, 2019 (the "LE ROUX Affidavit").  Above the signature is the statement "I know and understand the contents of the above mentioned declaration.  I have no objection to taking the prescribed oath.  The prescribed oath to be binding on my conscience."  Below all of that is the signature of a "warrant officer" with an address in Grahamstown, South Africa.  The contents of the LE ROUX Affidavit are reproduced below, verbatim, with the referenced pictures displayed under the relevant paragraphs[2]:

---

[2] Errors in spelling and punctuation are reproduced here without correction.

   a. At the begging on hunting season I write all the hunters down in the books and put as much information on as I have at that time and then leave the signed area blank. This way I know how many books to buy at the beginning of the season. When the hunters arrive all he or she does is sign and fill out the rest of the information and address where needed. That is why in Pic 1 you will see Clint's hunting license uncompleted as I didn't know his whole address at the time only that he was for Utah and the USA. This is a faulty hunting license as another client by mistake signed at the wrong spot under Clint's name. This being my mistake I sent it to [Wildlife Inspector] when she requested it but actually the correct hunting license for Clint is Pic 2 which is also the one we used to apply the export permits with.

 

   b. You will see in Pic 3 Lane has a green hunting license. This is a carbon copy and not the top page of the book. What happened here is the carbon paper was misplaced and it wrote through onto this green copy. You can clearly see in the background under Lane's details the details of Clint. You can also clearly see because they have the same license number (44789). Another thing is Lane and Clint, Pic 2 and Pic 3 have the same signature showing that it truly is a carbon paper error. This I never picked up and only saw it a few days ago when I was going through some emails that I sent to [Wildlife Inspector]. Even South African government never picked this up when I applied for Lane's export permit using the green copy. It just show you that the hunting license has NO real purpose in applying for an export permit as they are not even related. When the book gets full I throw it away as there is no point in keeping

old used copies and books.  They can anyway not be reused if a client comes back the following year because the hunting license is only valid for one year.



       c.     The hunting license is issued by the hunting outfitter and not by the government.  See Pic 4 and Pic 5 for examples of the book as well as a blank hunting license (Pic 4).  Note in Pic 5 the carbon paper that I've been referring to.




       d.       In South Africa you shoot the animal and then apply for the export permit. In other parts of Africa, you have to apply for a permit/tag before you arrive to hunt but in South Africa not.  Reason for this is me as a land owner, owns all the animals and the government has No say it what I do with them.

       e.       When I spoke to [Wildlife Inspector] earlier in the year I explained myself and why we applied for everything in 1 persons name.  She said things had changed and was no longer legal to do so.  Obviously this was already to late as the trophies were already in transit and I have to get 3 separate export permits each in the hunters names.  I told her I will do so and we left the conversation like that.  The next day I contacted my government and explained the situation to them.  They issued me with 3 new permits which I then sent to [Wildlife Inspector] as agreed.  She replied to my email with a "thank you".  The way I went about reapplying for 3 new permits was totally legal.  South African government got new permits issued through the government not through any private person or connection.

       f.       Regarding a Cities animal; No extra license or tag needs to be applied for prior to the hunt.  It is just like any other plains game animal.  You shoot it and then apply

23.     The LE ROUX Affidavit makes several statements that are inconsistent with other evidence and otherwise suggestive of an effort to smuggle animals that were not hunted with legally valid permits:

a.     First, the LE ROUX Affidavit does not explain the discrepancies between the Original Hunting Register — containing a signature in C.F.'s name dated April 23, 2018 — and the hunting registers submitted on March 5, 2019, which divide the animals between C.F., B.C., and L.L. and which contain signatures for the three of them dated April 20, 2018.  On their face, the March 5 Hunting Registers appear to be falsely backdated.  The Original Hunting license signed by C.F. accounts for all 23 animals.  Based on my training and experience investigating illegal hunts, it is unlikely that B.C. and L.L. contemporaneously signed alternate hunting registers — the March 5 L.L. Hunting Register and March 5 B.C. Hunting Register each likely contain forged and falsely backdated signatures.

b.     Second, the LE ROUX Affidavit claims that "Pic 2," which corresponds to the Original Hunting license, is valid despite the fact that it has the same number as the license in "Pic 3," which corresponds to the March 5 L.L. hunting license.  In my training and experience, each hunter must have his or her own unique license.

c.     Third, the license shown in "Pic 3," which corresponds in everything but color to the March 5 L.L. License is invalid on its face. As the affidavit admits, the license in Pic 3 bears a signature in the name of C.F..  However the license itself states that it "takes effect only if it is signed by the holder thereof."  In my training and experience, a hunter is only allowed to take an animal *after* signing a license.  Even if the C.F.'s signature appears on both licenses because of a "carbon paper error" it would not explain why there is no license with L.L.'s signature.  Finally, I have experience using carbon paper.  The markings in Pic 3 are, in my experience, not consistent with impressions made from the pressure of writing on the top-level paper  and are, instead, consistent with someone using an ink pen on the actual carbon paper to cover up the underlying carbon impressions.

24.     An FWS-OLE agent interviewed CHARL LE ROUX on February 28, 2020 in Port Elizabeth, South Africa.  LE ROUX identified himself with South African ID number 88032851010845.  During the interview he made the following statements in sum and substance and in pertinent part:

a.     LE ROUX owns approximately 400 hectares of land where he operates a lodge and guides hunts.

b.     LE ROUX explained that he buys pre-printed booklets of hunting licenses before each hunting season.  Each book contains twenty-five individually and sequentially numbered licenses.  Each license costs R20 (Rand).  After booking the season's hunts, he fills in the hunters' names and whatever other information he has.  The license is then signed by the respective hunter when he or she arrives.  At the end of the hunt he tears off the license and submits it, along with the "PH hunting register book" to South Africa's Department of Environmental Affairs.  Eventually, he throws the hunting license book away because no one ever asks for old books and he does not know of any reason to keep them.  LE ROUX stated that

17

he owns the game on his private land and, as a result, claimed that he does not need permission or a license to shoot those animals. Rather, LE ROUX stated that licenses are only necessary when an animal leaves his property, especially for export. Hunters provide LE ROUX with a $1,000 deposit and then pay their final bill at the end of the hunt. The final bill is based on the animals that a hunter decides to take. LE ROUX described it as a "menu" in which the cost of the animal is based on the number of animals available in the area.

c.      LE ROUX provided a hunt to C.F., B.C., and L.L., who be believed are related by blood or marriage. For this reason, he believed that their hunted animals could all be submitted in one shipment. LE ROUX said he had talked to Wildlife Inspector 2, whose identity is known to me, during a trade show in Portland Oregon. LE ROUX said that Wildlife Inspector 2 told him that he would have handled the shipment of 23 animals "differently" than Wildlife Inspector 1.

d.      LE ROUX handles all of the export paperwork for his clients. To export animals, he removes the first copy of the hunting license for a hunter, attaches it to the "pink" copy of the hunting register, after the hunter has signed it, and then sends those documents to a shipping agent. The shipping agent then applies for export permits, including any necessary CITES permit. In this case, LE ROUX believes that only C.F. would have received a copy of those documents from the shipping agent. LE ROUX claimed that his clients do not know anything about CITES permits and do not even know the CITES-status of the animals they shoot.

e.      LE ROUX was shown the March 5, 2019 L.L. Hunting License, which corresponds to "Pic 3" attached to the LE ROUX Affidavit. LE ROUX stated that he wrote L.L.'s name on the document but blamed the shadow of C.F.'s name on "messy" carbon paper. The agent told LE ROUX that it appeared the document in Pic 3 was the second copy page of C.F.'s license, but that LE ROUX had physically written L.L.'s details on it. LE ROUX could not explain how this could have happened and said that he had to think about it.

f.      Later, the FWS Special Agent again asked LE ROUX about why the March 5 2019 L.L. Hunting License, referenced as "Pic 3" in LE ROUX's affidavit, appeared to have L.L.'s name directly written over the carbon-copy of the Original Hunting License. LE ROUX could not explain why this was the case. The agent asked if it was possible that L.L. never had a hunting license and whether LE ROUX would have needed to later create a license to justify a new set of export permits. LE ROUX responded "I'm gonna say, what could have happened is because he threw aware the book which contained L.L.'s license, he might have written a new hunting permit for L.L. and somehow it," before stoping and saying it didn't make sense why he would have written over the carbon copy for the Original License.

g.      LE ROUX was shown the Original Hunting Register and admitted that a plain reading of it would indicate that C.F. had personally killed all of the listed animals. He also admitted that it was a false record of what each hunter had killed, but said that he did it that way because he thought that everything could be combined in one shipment. After the problem arose in Denver, LE ROUX had to go back to find the original hunting licenses. However, he believed that by then he had already thrown away the book with L.L.'s license. He completed new hunting licenses and registers for the hunters. LE ROUX said he didn't try to forge the

hunter's signatures, but that he did sign their names.  LE ROUX said he knew what to put on each register because he had photographs of the hunters with their respective animals. LE ROUX denied discussing with C.F., L.L. or B.C. his plan to submit new hunting registers and said he could not remember whether he told them he would be signing their names.

       h.     I interviewed Wildlife Inspector Gene Tucker on March 10, 2020, via telephone.  Wildlife Inspector Gene Tucker remembered speaking with LE ROUX at a wildlife trade show.  Wildlife Inspector Gene Tucker stated he told LE ROUX each hunter's animals must be contained and submitted in separate shipments, not combined as one.

## STATEMENT OF PROBABLE CAUSE

     25.     For the reasons set forth above I submit that there is probable cause to believe that on or about March 5, 2019, in the State and District of Colorado and elsewhere, the defendant CHARL LE ROUX did knowingly alter, conceal cover up, falsify and make false entries in a record, document, and tangible object, specifically Province of the Eastern Cape Hunting License 44789 issued to C.F., whose identity is known to me, with the intent to impede, obstruct and influence the investigation and proper administration of such matters within the jurisdiction of the United States Fish and Wildlife Service, a department and agency of the United States, and in relation to and in contemplation of such matter and case

     I declare under the penalty of perjury that the foregoing is true and correct to the best of

my knowledge and belief.

                           Respectfully Submitted,

                           *s/ William Stacy Campbell III*
                           William Stacy Campbell III
                           Special Agent
                           Fish and Wildlife Service, Office of Law Enforcement

Sworn to before me this  21st  day of June 2021.

_Michael E. Hegarty_
Hon. Michael E. Hegarty
United States Magistrate Judge

**Reviewed and submitted by Bryan David Fields, Assistant United States Attorney.**

19